

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 17, 2023

**BY ECF**
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Kazeem Raheem*, S1 21 Cr. 609 (LAP)

Dear Judge Preska:

      The Government respectfully submits this letter in advance of sentencing for defendant Kazeem Raheem (the "defendant") in the above-captioned case, currently scheduled for May 23, 2023, at 2:30 p.m.  On February 6, 2023, the defendant pled guilty pursuant to a plea agreement (the "Plea Agreement") in which the parties stipulated to a United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 51 to 63 months' imprisonment (the "Stipulated Guidelines Range").  As set forth in the Presentence Investigation Report (the "PSR"), the U.S. Probation Office ("Probation") has recommended a sentence of 48 months' imprisonment.  The defendant requests a noncustodial sentence of time served and three years of supervised release.

      For the reasons set forth below, the Government submits that a sentence at the low end of the Stipulated Guidelines Range is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**I. Background**

      **A. The Enterprise**

      The defendant was a member of a criminal enterprise (the "Enterprise") that committed a series of frauds, primarily business email compromises and romance scams, against individuals and businesses located across the United States, including in the Southern District of New York.  As a result of these frauds, more than 50 victims transferred more than $9 million to bank accounts under the control of members of the Enterprise.[1]  The defendant's role in the Enterprise – similar

---

[1] In referring to the number of victims in the charging documents and in calculating restitution payments, the Government has only included payments from so-called "confirmed" victims – that is, individuals and/or entities that law enforcement has interviewed and/or otherwise confirmed

to the role of most his co-defendants in this case – was to receive proceeds of the fraud schemes, and to thereafter send money to co-conspirators and other individuals.  Unlike most of his co-defendants, however, and as explained in more detail below, Raheem was not charged with opening bank accounts in fake names and aliases in order to receive the proceeds of the fraud schemes.

### 1. The Business Email Compromise Schemes

The objective of the Enterprise's business email compromise schemes was to trick businesses into transferring funds into accounts controlled by the Enterprise.  To do so, members of the Enterprise could compromise an actual email account of an employee of a victim company and/or a third party engaged in business with that company.  Alternatively, members of the Enterprise could create "spoof" email accounts with slight variations of email accounts used by employees of a company and/or third parties engaged in business with the company in order to impersonate those employees or third parties.  These fake email accounts were specifically designed to trick other employees of the company or third parties engaged in business with the company into thinking the fake email account was authentic.

The compromised email accounts and fake email accounts were then used to send instructions to transfer funds via wire or other means to certain bank accounts held under Enterprise control – accounts such as the ones opened and operated by the defendant.  In other words, the Enterprise tricked victims into transferring funds to accounts that the victims believed were controlled by or otherwise affiliated with the company from which the victims received the instructions, and which in many cases related to amounts actually owed by the victims to the companies with the compromised email accounts.  But, in reality, those bank accounts were controlled by members of the Enterprise.

### 2. The Romance Scams

The Enterprise conducted the romance scams primarily by using electronic messages sent via email, text messaging, social media, or online dating websites that deceived the victims, many of whom were vulnerable, older men and women, into believing the victims were in romantic relationships with fake identifies assumed by members of the Enterprise.  Once members of the Enterprise gained the trust of the victims, they used false pretenses to cause the victims to transfer funds via wire or other means to bank accounts the victims believed were controlled by their romantic partners and/or individuals or entities to whom their romantic partners were intentionally sending funds, when in fact the bank accounts were controlled by members of the Enterprise.  At times, members of the Enterprise also induced victims of romance scams to accept proceeds of

---

transferred funds to the defendants after falling prey to business email compromise schemes and/or romance scams. However, the fraudulent bank accounts opened by the defendants charged in this case received more than $9 million in funds from many more than 50 individuals and/or entities.

fraud schemes into their own accounts, and to subsequently transfer those funds to bank accounts under the control of members of the Enterprise.

### B. Raheem's Conduct

Raheem laundered money on behalf of the Enterprise. Specifically, Raheem accepted checks (typically cashier's checks) and/or money orders on behalf of an entity he owned and controlled named Larry Enterprises LLC. Between September 2018 and October 2021, Raheem accepted and negotiated over 150 checks and/or money orders on behalf of Larry Enterprises, totaling a little more than $4,000,000.

Many of the checks received by Larry Enterprises were sent by Raheem's co-defendants, and specifically from the fraudulent bank accounts held in the names of fake entities and/or aliases but controlled by the defendants. Specifically, on approximately 25 occasions, Larry Enterprises received a check from a bank account held in the name of a fake individual or entity, but actually controlled by one of Raheem's co-defendants. Those checks totaled approximately $991,065.

In addition to receiving the proceeds of fraud schemes from co-defendants or others, on several occasions Larry Enterprises received payments directly from confirmed victims[2] of the fraud schemes, including:

| Date | Amount | Victim | Type of Payment |
|---|---|---|---|
| 9/6/18 | $17,000 | Victim-12 | Cashier's Check |
| 11/21/18 | $52,000 | Victim-12 | Cashier's Check |
| 8/18/20 | $120,000 | Victim-34 | Cashier's Check |
| 5/6/21 | $50,000 | Victim-35 | Cashier's Check |
| 7/31/21 | $60,000 | Victim-34 | Cashier's Check |

Each of the above victims fell prey to a romance scam. Specifically:

- <u>Victim-12</u>: Around August 2018, Victim-12 met an individual ("Individual-1") through an online dating website, after which they talked by phone and email. Eventually, Individual-1 told Victim-12 that he had to pay to work on oil rigs in Saudi Arabia and that, because he did not pay all of the necessary fees, he was taken off the oil rigs and put in prison for fraud against the government. At Individual-1's request, Victim-12 sent

---

[2] In calculating the loss amount and forfeiture figures, the Government has taken the position that all funds transferred into accounts held by the defendants in the name of fake individuals or businesses (or, in this case, all checks deposited by Larry Enterprises) are proceeds of fraud. However, for restitution purposes, the Government has included only transfers of funds from individuals or entities that have spoken to law enforcement and confirmed the details of their fraud schemes.

    numerous cashier's checks, including the above two checks to Larry Enterprises, i.e., a $17,000 check on or about September 5, 2018 and a $52,000 check on or about November 21, 2018.

- <u>Victim-34</u>:   In April 2021, Victim-34 began communicating with an individual ("Individual-2") on an online dating service who claimed that he was a military sniper on mission in Denmark. Eventually, Individual-2 began asking Victim-34 to send him money. When Victim-34 refused, Individual-2 began to threaten her. Sometime thereafter, Individual-2 claimed that his accounts had been hacked and the messages asking for money and making threats were not from him. However, at some point after that, Individual-2 resumed requesting money and making threats. Eventually, Victim-34 sent two cashier's checks at Individual-2's direction to Larry Enterprises, one on July 31, 2021 in the amount of $120,000 and the other on August 13, 2021 in the amount of $60,000.

- <u>Victim-35</u>:  Victim-35 began communicating with an individual ("Individual-3") claiming to be a well-known conservative political commentator ("Commentator-1") after a person claiming to be Commentator-1 replied to one of Victim-35's posts on a political website. Individual-3 – still pretending to be Commentator-1 – suggested that Individual-3 and Victim-35 continue talking via WhatsApp. After communicating for approximately one year, Individual-3 began discussing a job opportunity for Victim-35 in Washington DC. At Individual-3's direction (and still under the pretense that Individual-3 was actually Commentator-1), Victim-35 purchased iPhones and sent them to an address in Staten Island where Individual-3 said they would be received by his personal assistant. Victim-35 also sold her personal residence in order to move to Washington DC and work with Individual-3 (again, believing that Individual-3 was actually Commentator-1). At Individual-3's request, Victim-35 took the proceeds from the sale of her property and, on or about May 3, 2021, sent two cashier's checks for $50,000 each, including one made payable to Larry Enterprises, LLC.

Unlike his co-defendants, who used aliases to open bank accounts at financial institutions to receive fraudulent proceeds, Larry Enterprises was held in Raheem's name, and the funds it received were typically in the form of cashier's check and/or money orders. Therefore, Raheem was not charged in Count Two of the indictment, i.e., with conspiracy to commit bank fraud.

### C. Procedural History, the Plea Agreement, and the PSR

The defendant was arrested on October 13, 2021 pursuant to an indictment charging him with one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Eleven defendants were charged in the indictment with one or both of money laundering conspiracy and/or conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. One defendant was also charged with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), (b), and 2. On December 27, 2021, a superseding indictment was unsealed charging the eleven defendants charged in the indictment with the same crimes, but adding a twelfth defendant.

On February 6, 2023, Raheem pled guilty to Count One of the superseding indictment, charging conspiracy to commit bank fraud, pursuant to the Plea Agreement. In the Plea Agreement, the parties agreed to an offense level of 24 and a criminal history category of I, resulting in a Guidelines range of 51 to 63 months' imprisonment. The defendant also agreed to forfeit $4,045,784.60 and to pay restitution in the amount of $299,000.00.[3]

Probation also calculates a Guidelines range of 51 to 63 months' imprisonment. Probation recommends a sentence of 48 months' imprisonment, a slight variance from the bottom of the Guidelines range. The defendant requests a noncustodial sentence of time served, with three months of supervised release.

## II. Discussion

### A. Relative Culpability

Raheem will be the sixth defendant sentenced in this case.[4] The defendant's receipt of a little more than $4 million in fraud proceeds places him near the top of his co-defendants when measured by the total amount of money received. In addition, the defendant's receipt of these funds – including the receipt of funds directly from victims of the fraud schemes, as evidenced in the chart included above at page 3 - spanned approximately three years, and included accepting over 150 checks and/or money orders. For these reasons, the Government views the defendant as towards the bottom of the top tier of relative culpability. A table indicating the Government's

---

[3] As indicated above, *supra* note 1, in calculating restitution amounts, the Government included only transfers of funds from so-called "confirmed" victims of the fraud schemes, that is, individuals and/or entities that provided information to the Government confirming that they were, in fact, victims of business email compromise schemes or romance scams. However, in calculating forfeiture amounts (and the loss amount for purposes of the Guidelines), the Government has taken the position that, absent some other explanation for the funds, all funds transferred into a bank account held in the name of an alias and/or a fake company and which is known to have received confirmed victim funds – or, in this instance, all funds deposited by Larry Enterprises LLC – should be considered proceeds of fraud by a preponderance of the evidence. Therefore, the Government has sought forfeiture of the total amount transferred into the defendants' accounts – except for any transfers that originated from accounts controlled by the same defendant as the recipient account – while only seeking restitution of transfers from confirmed victims.

[4] The fifth, Olawoyin Peter Olarewaju, is scheduled to be sentenced at 2:00 p.m. on May 23, 2023, immediately before Raheem.

5

view of the defendants' approximate relative culpability, divided into three tiers, is set forth below.[5]

| Name | Count One | Count Two | Count Three | Approx. Total Loss | Guidelines Range | Sentence |
|---|---|---|---|---|---|---|
| **Tier 1** | | | | | | |
| Adedayo John | X | X | | $4.51M | 70-87 | N/A |
| Oluwadamilola Akinpelu | X | X | | $5.07M | 41-51 | N/A |
| Morakinyo Gbeyide | X | X | X | $3.76M | 51-63 | N/A |
| Kazeem Raheem | X | | | $4.04M | 51-63 | N/A |
| **Tier 2** | | | | | | |
| Smart Agunbiade | | X | | $1.77M | 33-41 | N/A |
| Lateef Goloba | X | X | | $1.82M | 33-41 | 24 months |
| Samsondeen Goloba | X | X | | $1.56M | 33-41 | 20 months |
| Emmanuel Oronsaye-Ajayi | X | X | | $1.93M | 33-41 | 24 months |
| Aramiwale Shittu | X | X | | $197K | 15-21 | N/A |
| Warris Adenuga | X | X | | $977K | 27-33 | 15 months |
| **Tier 3** | | | | | | |
| Olawoyin Peter Olarewaju | X | X | | $475K | 21-27 | N/A |

As noted above, Raheem is the only convicted defendant who was only charged with money laundering conspiracy and was not also charged with conspiracy to commit bank fraud.[6] Since the other defendants entered into plea agreements pursuant to which they pled guilty to conspiracy to commit bank fraud (Count Two), but not money laundering conspiracy (Count One), Raheem is the only defendant who was convicted of money laundering conspiracy. As a result, he is the only defendant subject to the two-point offense level enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B) for convictions under 18 U.S.C. § 1956.

Of course, the fact that the defendant was only charged with one crime does not mean he is less culpable than his co-defendants who were charged with two crimes. To the contrary, as explained above and indicated in the table, the Government views Raheem's conduct as placing him towards the bottom of the top tier of relative culpability.

---

[5] The table excludes defendant Olawale Olaniyan, who passed away while on pretrial release. (Dkt. 202.) The Guidelines ranges included herein are based on the plea agreements entered into between the parties, and are subject to change if any defendant (for example, Adedayo John) successfully withdraws a guilty plea.

[6] Olaniyan was similarly only charged with money laundering conspiracy.

### B. A Sentence at the Low End of the Stipulated Guidelines Range is Appropriate

The Government respectfully submits that a sentence at the low end of the Stipulated Guidelines Range of 51 to 63 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

The defendant committed a serious crime. As the Court is well aware from the victim impact statements and prior sentencings in this case, many of the victims suffered significant emotional and financial turmoil as a result of the business email compromise schemes and romance scams perpetrated by the Enterprise. Victims of the Enterprise were tricked into sending money to fraudsters, for example, under the guise of making a down payment for a home or based on the false pretense that the recipient of the funds was in love with the victim. While the defendant is not accused of personally participating in these underlying fraud schemes, the schemes only thrive when people, such as the defendant, are willing to receive and assist in laundering the proceeds of the fraud schemes. The role played by Raheem and his co-defendants is essential to the operation of the schemes. Accordingly, a substantial custodial sentence is necessary in order to reflect the seriousness of the offense and promote respect for the law.

In addition, as noted above, the defendant's conduct spanned three years and included accepting over 150 checks and/or money orders totaling more than $4 million. This was not an isolated incident nor momentary lapse in judgment. The defendant repeatedly engaged in this conduct over a long period of time, causing harm to numerous victims over the course of years. The period of time over which the defendant accepted and laundered funds and the total amount of received funds puts him in the top tier of defendants in terms of relative culpability, and the Court's sentence should reflect that.

An appropriate sentence should also consider the need for deterrence and protect the public from future crimes of the defendant. The types of schemes perpetrated by the Enterprise are, unfortunately, exceedingly common, and there are many individuals who stand ready and willing to accept fraud proceeds and assist fraudsters in perpetrating these schemes. The defendant's sentence should send the message to this defendant and to all others considering laundering money in connection with similar fraud schemes that this conduct has serious consequences. A substantial sentence is necessary to afford adequate deterrence and to protect the public.

Nevertheless, the Government acknowledges that Raheem is the only defendant subject to the two-point enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B) for being convicted under 18 U.S.C. § 1956. The Government further acknowledges that Raheem's co-defendants only avoided this enhancement by pleading guilty to a different crime than Raheem, even though virtually all of them were also charged with money laundering conspiracy. In other words, the fact that Raheem was only charged with one crime ultimately exposed him to an offense level enhancement that was not applied to his co-defendants who were charged with two crimes. To be sure, the enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B) is clearly applicable to Raheem, and the Guidelines range is appropriately calculated as 51 to 63 months' imprisonment. However, in light of these

7

circumstances, the Government is seeking a sentence at the low end of the Stipulated Guidelines Range.[7]

### III. Conclusion

For the reasons set forth above, the Court should issue a sentence at the low end of the Stipulated Guidelines Range.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:         /s/        
Kaylan E. Lasky
Matthew Weinberg
Assistant United States Attorneys
(212) 637-2315 / 2386

Cc: Todd Spodek, Esq. (by ECF)

---

[7] The Government notes that, without the two-point enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B), the defendant's offense level would be 22, rather than 24, and the corresponding Guidelines range would be reduced from 51 to 63 months' imprisonment to 41 to 51 months' imprisonment. A sentence at the low end of the Stipulated Guidelines Range, i.e., 51 months, is still within that reduced Guidelines range.